2

```
 1                UNITED STATES DISTRICT COURT
 2                CENTRAL DISTRICT OF CALIFORNIA
 3                     WESTERN DIVISION
 4
 5   OSKAR SYSTEMS, LLC,        )
                                )
 6            Plaintiff,        )
                                )
 7       vs.                    ) No. CV09-03854 AHM (SHx)
                                )
 8   CLUB SPEED, INC., et al.,  )
                                )
 9            Defendants.       )
     _____)
10
11
12
13
14
15       Deposition of FELIX LIVNI, individually and as
16   30(b)(6) witness for OSKAR Systems, LLC, taken on behalf
17   of the Defendants Pole Position Raceway, Inc., P2R
18   Karting, Inc., Ken Faught, and Jason Williams, commencing
19   from 9:34 a.m. to 3:45 p.m., Tuesday, June 29, 2010, at
20   10990 Wilshire Boulevard, Fourth Floor, Los Angeles,
21   California, before Gale M. Lucas, CSR No. 7899, RPR, RMR,
22   CRR, CLR.
23
24
25
```

Livni

EXHIBIT A PAGE 2

```
 1   APPEARANCES:

 2

 3   FOR PLAINTIFF:

 4       RUTAN & TUCKER, LLP
         BY:  ALEJANDRO S. ANGULO, ESQ.
 5       611 Anton Boulevard
         Suite 1400
 6       Costa Mesa, California  92626
         (714) 641-5100
 7       aangulo@rutan.com

 8
     FOR DEFENDANTS POLE POSITION RACEWAY, INC.; P2R KARTING,
 9   INC.; KEN FAUGHT; and JASON WILLIAMS:

10       BAKER MARQUART CRONE & HAWXHURST LLP
         BY:  DARYL M. CRONE, ESQ.
11       10990 Wilshire Boulevard
         Fourth Floor
12       Los Angeles, California  90024
         (424) 652-7800
13       dcrone@bmchlaw.com

14
     ALSO PRESENT:
15
         Ken Faught
16       Jason Williams

17

18

19

20

21

22

23

24

25
```

Livni

EXHIBIT A PAGE 3

```
1                        I N D E X
2
3   WITNESS                                          PAGE
4   FELIX LIVNI
5      BY MR. CRONE                                  6, 92
6      (Afternoon proceedings)                       92
7      (Confidential Transcript)                     135 - 185
8
9                      MARKED EXHIBITS
10
    NUMBER         DESCRIPTION                       PAGE
11
       37    String of e-mails, first of which is    112
12           August 13, 2007 e-mail to Jeff Ward,
             et al., from Mike Conte regarding
13           "Adams and Speed Sheet" (Bates-
             stamped OSK 010420 through OSK 010422)
14           (3 pages) (Bound under confidential
             cover)
15
       38    String of e-mails, first of which is    119
16           January 21, 2009 e-mail to Jeff
             Ward from Steve Peters regarding
17           "The Story of Club Speed" (Bates-
             stamped OSK 010475 through
18           OSK 010477) (3 pages) (Bound under
             confidential cover)
19
       39    December 3, 2008 e-mail to jeff@        126
20           oskarsystems.com from Jeff Ward
             regarding "Event_management.jpg"
21           (Bates-stamped OSK 010390) (1 page)
             (Bound under confidential cover)
22
       40    Document entitled "raceassembly-        148
23           interface.cs,v" (not Bates-stamped)
             (13 pages) (Bound under confidential
24           cover)
25
```

Livni

5

1 INDEX (continued)

2

3 MARKED EXHIBITS

4  NUMBER           DESCRIPTION                              PAGE

5   41    Complaint for Copyright Infringement,              177
          dated May 26, 2009, with related
6         attachments (not Bates-stamped)
          (23 pages)
7

8

9                  PREVIOUSLY MARKED EXHIBITS

10 NUMBER           DESCRIPTION                              PAGE

11  30    December 3, 2008 e-mail to                         126
          oskar@oskarsystems.com from Jeff
12        Ward regarding "Event_management.jpg"
          (Bates-stamped OSK 010389) (1 page)
13        (Bound under confidential cover)

14  34    Certificate of Registration for                    104
          OSKAR Go Kart Business Software,
15        dated February 17, 2009 (not
          Bates-stamped) (1 page)
16
    35    OSKAR Systems, LLC's Disclosure                    167
17        of Expert Witnesses, dated June 23,
          2010 (not Bates-stamped) (4 pages)
18

19

20                  INFORMATION REQUESTED:

21                         (None)

22

23       QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

24                         (None)

25

Livni

```
                                                                    6

 1                    LOS ANGELES, CALIFORNIA

 2              TUESDAY, JUNE 29, 2010; 9:34 A.M.

 3                           * * *

 4

 5                         FELIX LIVNI,

 6         having been first duly sworn by the deposition

 7          reporter, was examined and testified as follows:

 8

 9                         EXAMINATION

10   BY MR. CRONE:

11       Q.   Good morning, Mr. Livni.  You were present for

12   yesterday's deposition of Michael Conte; is that right?

13       A.   Yes, I was.

14       Q.   Have you been deposed before?

15       A.   No.

16       Q.   You heard the admonitions I gave Mr. Conte at

17   the beginning of the deposition, but would you like me to

18   repeat them for you?

19       A.   No, that's not necessary.  I heard.

20       Q.   Okay.  You understand that you are under oath?

21       A.   Yes, I do.

22       Q.   Okay.  Could you let me know -- have you

23   graduated college?

24       A.   Yes.

25       Q.   Where did you go to college?
```

                                                    Livni

26

1 have the beginning result, but you wouldn't have the
2 middle result code that was put in, but then later taken
3 out. So you're saying there's no way for that to have
4 ever happened?
5     A. Yeah, I'm not sure if I follow the logic.
6     Q. Well, if you have -- let me give an analogy
7 that's a little bit, at least for me, readily
8 understandable.
9     A. Yep.
10     Q. If I have a book and I'm editing the book as I
11 go along, and there's a Chapter 5 that used to exist at
12 some point in the version history --
13     A. Yeah.
14     Q. -- six months ago, I put it in and then I took
15 it out.
16     A. Yeah.
17     Q. You're reading the final book, and you have no
18 idea because you go from Chapter 4 to 6.
19     A. Sure.
20     Q. Obviously, they are consecutively numbered now,
21 but there's no way for you to know that it once existed
22 and now it doesn't exist.
23     A. I got it.
24     Q. The question is: Would Visual SourceSafe or any
25 source control program be able to say, definitively,

Livni

1 there was a Version -- there was a Chapter 5 that
2 existed?
3     A.  I believe the answer is it is not possible to
4 say definitively. If you have administrator access to
5 source control, then you can usually -- it's not easy to
6 do, but it is possible. There's facilities in all of the
7 source control systems I know to go and -- it's called
8 obliteration, usually. It's to obliterate a file. And
9 it's not something that I do. It's -- because you -- the
10 history is valuable.
11     But yeah, you can remove from the history. It's
12 similar to an accounting package that has transaction
13 logs. You know, maybe the average user doesn't have
14 privileges to do that, but someone with administrative
15 access could go in and edit the thing directly.
16     Q.  I see.
17     So if you have administrative control, you would
18 have the ability to obliterate the track history,
19 essentially?
20     A.  Yeah, sure, or aspects of it.
21     Q.  And if you had administrative control,
22 presumably you would also be able to change the history,
23 also?
24     A.  I don't think that -- I mean, with -- the thing
25 is, is with -- if you have physical access to a machine,

Livni

1  you can essentially do anything. There's -- it's no
2  longer a restriction of software. There's -- you know,
3  once you have physical access to a machine, there's no
4  protection that is available to you.
5      Q.  What do you mean by that?
6      A.  If you have physical access to the machine, you
7  can change the ones and zeros on your machine to do
8  anything you want.
9      Q.  I see.
10         So if somebody --
11     A.  Given enough skill and time.
12     Q.  I see.
13         So given enough skill and time, one could change
14  the source control history directly any way, essentially?
15     A.  Yes.
16     Q.  Okay. Also, I attempted to look last night at
17  Perforce on the Internet because I was unfamiliar with
18  the program.
19     A.  Okay. Yep.
20     Q.  One of the things that I thought was interesting
21  was apparently, there is a feature that permits you to
22  designate certain files as not being tracked by the
23  Perforce system.
24         Are you aware of that feature?
25     A.  So whether files are tracked -- I'm not aware of

Livni

38

1    Q.   You testified that, I believe, you started at
2    Microsoft at around June of 2005?
3    A.   Yes.
4    Q.   And why did you leave -- I guess -- well, let me
5    start over.
6         At the time when you started working in 2002,
7    you were working for Contemporary Systems, Inc.; right?
8    A.   When I -- I think I started in December 2001.
9    Q.   I'm sorry.
10   A.   Okay.
11   Q.   So when you started work on OSKAR Version 1.0,
12   were you at that time working as an event contractor for
13   Contemporary Systems, Inc.?
14   A.   I believe so.
15   Q.   When you started employment in 2002, it was for
16   Contemporary Systems, Inc.; right?
17   A.   Yes.
18   Q.   Okay.
19   A.   I just want to be careful. I don't know if it's
20   Contemporary Systems, Inc., or Contemporary Systems, LLC,
21   or, you know, exactly how all of that works.
22   Q.   I will represent to you I'm not trying to trick
23   you about the corporate form.
24   A.   Okay.
25   Q.   But my question, then, is:  In 2005, you then

Livni

51

1 many pixels high and placed in such and such a position
2 on the screen, instead you can use an editor, where it's
3 visually. You can put buttons and drag windows and stuff
4 like that. And underneath it, it is creating code for
5 you. So then you could go back and, you know, change the
6 code if you wanted to, you know, do that, or you could go
7 back into the editor and move stuff around.
8 Now, for most of the business logic of the
9 software, that's not true. You don't get any tools like
10 that. But for user interface stuff, that's very typical.
11     Q. I see.
12 So it wasn't as if there was sort of like a box
13 of prewritten code, like in terms of collecting customer
14 information, that you just input in there?
15     A. No. No.
16     Q. You wrote all of that from scratch?
17     A. Absolutely.
18     Q. I think I have this right. You were not an
19 employee of Contemporary Systems, Inc., until after
20 Version 1.0 had been written; right?
21     A. I believe that's true.
22     Q. At any point in time, from when you first
23 started working with Mr. Conte to today, have you ever
24 executed any assignment of copyright to Contemporary
25 Systems, Inc.?

Livni

```
1    A.   I'm not sure what that means.
2    Q.   Well, have you ever had a written agreement of
3  any kind in which you assigned a copyright interest to
4  Contemporary Systems, Inc.?
5    A.   My guess is no, because I don't know what you're
6  talking about.
7    Q.   Okay.
8         MR. ANGULO:  Move to strike on speculation.
9         Don't guess.
10        THE WITNESS:  Okay.
11        MR. ANGULO:  I mean, it's "yes" or "no."  If you
12 don't --
13        THE WITNESS:  I don't understand the question.
14 Sorry.
15 BY MR. CRONE:
16   Q.   Do you recall ever signing any agreement?  I'm
17 not asking you to speculate.
18   A.   Sure.
19   Q.   I'm just asking:  Do you recall, to the best of
20 your recollection, signing any agreement in which you
21 assigned a copyright to Contemporary Systems, Inc.?
22   A.   What would such an agreement look like?
23   Q.   It would say, I assume, "Assignment" at the top,
24 and it would state terms regarding the assignment of
25 copyright to Contemporary Systems, Inc.
```

Livni

1    A.   Okay.  I've never assigned anything like that.
2    Q.   Okay.  And that would be true of OSKAR Systems,
3    LLC, too?
4    A.   Yes.
5    Q.   Okay.  With respect to -- let me start over
6    again.
7    A.   Also, I can be clear.  Maybe this helps.  The
8    code was never owned by me.  I was writing -- I was
9    initially employed as a contractor to write code for
10   Contemporary Systems.  The code was not owned by me, no,
11   no part of the code, and none of the ideas around this
12   were owned by me.  I was just, you know, employed to do
13   that.
14        And then when I became an employee, again, you
15   know, the code and the ideas around this were not owned
16   by me.  This is typical in the software industry, that
17   contractors don't own the work that they produce.  The
18   company that hired them owns the work.
19   Q.   And that was based on your understanding, but
20   not a written agreement; right?
21   A.   Again, I'm unclear.  I didn't -- I never signed
22   over any, but -- any agreement that said I'm
23   transferring, but my understanding is that there would be
24   no transfer because I never owned anything related to
25   that.

Livni

1  net uses. Dr. Locke has a lot of experience with Java.
2  Java has many of the similar qualities to dot net in that
3  it is compiled into an intermediate language, that that
4  intermediate language is fairly high level.
5      Dr. Locke had a lot of just general programming
6  experience. He had been involved in many litigations
7  that were similar, and I had a lot of confidence after
8  talking to him that he would be a fantastic expert for us
9  to retain.
10     Q.   So in the same vein as you being able as a
11 programmer with significant Java experience, being able
12 to program in dot net fairly easy, after some --
13     A.   Yes.
14     Q.   -- ramp-up time --
15     A.   Yep.
16     Q.   -- Dr. Locke would be able to do essentially the
17 same thing?
18     A.   Yeah. Although, to be clear, we weren't asking
19 him to write software. We were asking him to be a
20 forensic expert.
21     Q.   Sure. Sure.
22     During the second call you identified -- I
23 believe I got this right -- that you were identifying
24 areas that you believe Dr. Locke might be interested in
25 looking at in order to make his job a little bit easier;

Livni

1  right?
2  A.  Yep.
3  Q.  Other than the score sheets area, do you recall
4  what other areas you asked him to look at?
5  A.  I believe so.  And if I were to give you a list,
6  I -- there might be some things in my list that I forgot
7  to ask him, and there might be some things in my list
8  that were missing.  So I'm going to kind of regenerate
9  the list of things that I think that I asked him.
10 Q.  I can only ask you to give me the best
11 recollection that you can.
12 A.  I don't recollect exactly what I asked him.
13 Q.  So other than the score sheets, you don't
14 recall, sitting here, any other area that you asked him
15 to look at?
16 A.  Let me think for a while.  I want to make sure
17 that it really is an area that I asked him.  There are
18 some great candidates.  I just don't remember exactly
19 which ones I talked about.
20 Q.  Okay.
21 A.  I can remember one for sure.  So one is, I asked
22 him to look at the database schema.
23     Another area is, I asked him to look at -- this
24 is kind of an internal infrastructure piece, but I asked
25 him to look at how the interface between the OSKAR

Livni

87

1   server, which we called the brain, how the interface
2   between that and the clients looked and operated, because
3   OSKAR does this interface in a particularly unique way.
4           And I was very, very interested -- this is such
5   a structural piece. It's an architectural piece. And I
6   have not really seen that approach used anywhere else, in
7   my experience. And I was very interested if Club Speed
8   or Speed Sheet had copied that approach. And I thought
9   that that would just be a very fruitful place for him to
10  look. That was another area.
11      Q.   Okay. Anything else that you can recall,
12  sitting here?
13      A.   I can't remember exactly right now.
14      Q.   Then you had a third call with Dr. Locke, and I
15  believe you testified that was after you had already seen
16  his draft report; is that right?
17      A.   Yes.
18      Q.   Did the draft report include an analysis of all
19  of the various areas that you had asked Dr. Locke to
20  initially look at?
21      A.   No, it didn't.
22      Q.   Did you ask Dr. Locke why that was the case?
23      A.   No, I didn't, although I believe that Dr. Locke
24  didn't -- well, one, didn't write everything he found in
25  his draft report. He probably didn't want something that

Livni

104

```
 1              MR. CRONE:  If you could read it back.
 2              (The record was read as follows:
 3              "Q.  Do you understand that in
 4         addition to testifying today as an
 5         individual, you're also testifying as
 6         a corporate designee of OSKAR Systems,
 7         LLC?")
 8              THE WITNESS:  Yes, I do.
 9    BY MR. CRONE:
10         Q.  Do you understand on what topics you're prepared
11    to testify to on behalf of OSKAR Systems, LLC?
12         A.  No, I don't.
13         Q.  Before I forget, after you obtained from the
14    Perforce system these prior versions of the OSKAR Systems
15    source code, did you attempt to run any particular
16    version to verify that, in fact, it was a fully
17    operational version?
18         A.  No, I didn't.
19         Q.  Mr. Livni, I'm going to show you what's been
20    previously marked as Exhibit 34.
21         A.  Uh-huh.
22         Q.  And it was shown at Mr. Conte's deposition
23    yesterday.
24         A.  Yep.
25         Q.  Have you seen this document before?
```

Livni

124

1   Q.  Okay.
2   A.  I don't think that I got to that level of
3   detail.
4   Q.  By the way, did you have any understanding at
5   the time as to whether or not -- as to even who Eric
6   Novakovich was?
7   A.  No, not really. I recognized the name, and I
8   knew that he was involved with Pole Position, but I
9   didn't really know who he was.
10  Q.  Did you know who Shingo Suzuki was?
11  A.  Yes, I did. I knew Shingo from working at OSKAR
12  Systems. He worked at Champs, and it was connected
13  physically.
14  Q.  Okay. Just to clarify the answer you just gave,
15  Shingo Suzuki never worked at OSKAR Systems, LLC. He
16  worked --
17  A.  Yes, that's true.
18  Q.  Okay. But he worked at Champs Karting instead?
19  A.  True.
20  Q.  If I could direct your attention to the e-mail
21  immediately above that, which is an e-mail from Jeff
22  Ward, dated January 21st, 2009, earlier in the day than,
23  obviously, the ones above it. And as it continues onto
24  the second page of the exhibit, next-to-last paragraph,
25  it says:

Livni

```
 1              "I spoke with Jonathan on Monday
 2         and he is trying to contact Felix.  His
 3         copyright specialist is still looking
 4         for additional code and we are in a
 5         holding pattern until the additional
 6         code has been sent.  Unfortunately, this
 7         has been a sticking point for several
 8         months.")
 9              Do you see where I'm reading?
10         A.   Yes.
11         Q.   Do you know what additional code was being
12    looked for?
13         A.   I have absolutely no idea.
14         Q.   Did you have any understanding as to why there
15    was a holding pattern until the additional code had been
16    sent?
17         A.   Yeah.  I'm skeptical that there was a holding
18    pattern, but I don't know why there would have been if
19    there was.
20         Q.   Do you have any understanding why there would
21    have been a sticking point for several months if you had
22    collected the code, I believe as you earlier testified,
23    in 2008?
24         A.   No.  I don't quite understand this paragraph.
25         Q.   Mr. Livni, I'm going to show you what's been
```

Livni

187

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2

 3        I, FELIX LIVNI, do hereby certify under penalty

 4   of perjury that I have read the foregoing transcript of my

 5   deposition taken on June 29, 2010; that I have made such

 6   corrections as appear noted herein; that my testimony as

 7   contained herein, as corrected, is true and correct.

 8

 9        Dated this _____ day of _____ 2010,

10   at _____, California.

11

12

13

14                         FELIX LIVNI
```

EXHIBIT A PAGE 20

```
                                                            188

1   STATE OF CALIFORNIA          )
                                 )
2   COUNTY OF ORANGE             )

3

4           I, Gale M. Lucas, Certified Shorthand Reporter

5   No. 7899, do hereby certify:

6           That prior to being examined, the witness named

7   in the foregoing deposition was by me duly sworn to

8   testify to the truth, the whole truth and nothing but the

9   truth;

10          That said deposition was taken down by me in

11  shorthand at the time and place therein named, and

12  thereafter reduced to print by means of computer-aided

13  transcription; and the same is a true, correct and

14  complete transcript of said proceedings.

15          I further certify that I am not interested in the

16  event of the action.

17          Witness my hand this 1st day of July, 2010.

18

19          _____
            Gale M. Lucas, RPR, RMR, CRR, CLR
20          Certified Shorthand Reporter
            in and for the State of California
21          License No. 7899
            Expiration Date:  January 31, 2011
22          Henjum Goucher Reporting Services
            1-888-656-DEPO
23

24

25
```

Livni